**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EDWARD CARTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 12 C 1431 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## **MEMORANDUM AND ORDER**

The plaintiff, Edward Carter, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2).[1] Mr. Carter asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Mr. White applied for DIB on August 20. 2010, alleging that he had been disabled since March 18, 2006, due to sarcoidosis. (Administrative Record ("R.") 144-45, 172). His application was denied initially and upon reconsideration. (R. 69-71, 75-77). Mr. Carter continued pursuit of his claim by filing a timely request for hearing. (R. 81). An administrative law judge ("ALJ") convened a hearing on September 6, 2011, at which Mr. Carter, represented by counsel, appeared and testified. (R. 38-64). In addition,

---

[1] Mr. Carter also filed an application for Widowers' Insurance Benefits. (R. 162).

a vocational expert, Stephen Sprauer, also testified. (R. 57-62). On September 15, 2011, the ALJ issued a decision denying Mr. Carter's application for DIB because, although he could not perform any of his past relevant work, he could perform a limited range of medium work. (R. 26-33). This became the final decision of the Commissioner when the Appeals Council denied Mr. Carter's request for review of the decision on January 6, 2012. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Carter has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### The Vocational Evidence

Mr. Carter was born on September 18, 1959, making him nearly fifty-two years old at the time of the ALJ's decision. (R. 144). He is 5' 11" and weighs 200 pounds. (R. 172). He has a high-school education. (R. 173). Mr. Carter's entire work history has been as a machinist. It was a job that sometimes required him to lift as much as fifty pounds, but generally no more than ten pounds. (R. 174). Mr. Carter stopped working when he was laid off on March 18, 2006, and was never called back. (R. 172).

### B.

### The Medical Evidence

Mr. Carter was diagnosed with sarcoidosis in 1995 (R. 314). Although he is a non-smoker, the disease settled into his lungs, causing shortness of breath and a hacking cough. (R. 285). Chest x-rays from October 30, 2002, showed abnormal densities in

both lung apices extending into both upper lobes, and a close follow up was recommended. (R. 246). The radiologist believed the changes might have been chronic. During an emergency room visit on November 22, 2004, eosinophil levels were noted to be 11, which was well above the normal range of 0-4. (R. 248). A chest x-ray on March 19, 2005, showed a "new infiltrate of the right lower lung since 11/22/04" (R. 278). A spirometry test taken in January 2005, revealed FEV and FEV1 to be 66% of predicted values at 3.35 and 2.75 liters, respectively. (R. 258). Diffusion rate – DCLO – was just 43% of predicted value, and was described as "severely reduced." (R. 256, 258).

The disease also spread to Mr. Carter's sinuses; on July 21, 2006, his primary physician Keith Gordey noted overall decreased symptoms but "Sarcoid[osis] involvement of sinuses (bloody lac duct)" (R. 274). In April 2007, Dr. Gordey reported that a spirometry test showed "mod[erate] restriction, worse than 1/05. A prog[ressive] disease & lack of active Rx" (R. 270). The doctor recommended routine steroid injections for treatment but noted that Mr. Carter's "insight was very limited." (R. 270). At that time, Mr. Carter had a minor cough and sinus congestion. He had increased shortness of breath on exertion but was still able to work out. (R. 270).

At the pulmonary clinic in August of 2007, Mr. Carter reported that he had no new complaints. He was not having shortness of breathing or bouts of coughing. (R. 268).

Mr. Carter suffered numbness and tingling in both hands, with occasional neck pain. A September 2007 chest x-ray revealed mild to moderate chronic fibrotic changes in the apices, greater on the right than the left. There were also mildly prominent interstitial infiltrates. The likely conclusion was chronic interstitial fibrosis. (R. 257). A

3

spirometry test taken on September 27, 2007, showed a 69% FVC (3.07) and 77% FEV1(2.51). (R. 277). Diffusion rate was 49% of the predicted value. (R. 277).

In November of 2007, Mr. Carter had a check-up at the pulmonary clinic. He reported some occasional paresthesias in his left fingers, but said his breathing was "real good." All his symptoms had improved on Prednisone. (R. 266).

At the pulmonary clinic in July of 2008, Mr. Carter reported that he felt good. He was experiencing some paresthesias. His sarcoidosis symptoms, however, had been resolved with Prednisone and his dosage was lowered. (R. 264).

In February of 2009, Mr. Carter had a check-up at the pulmonary clinic. His paresthesias had resolved and he reported no shortness of breath or cough. Sarcoidosis symptoms seemed to have been suppressed with Prednisone. (R. 262).

In April 2009 Mr. Carter went to Hines Veterans Hospital and reported that he was having one episode of left-sided chest pain per day. It did not occur when he exercised or exerted himself. Mr. Carter explained that his shortness of breath had significantly improved with Prednisone. (R. 339). There was volume loss in the right lung. (R. 341). Chest x-ray showed right upper lung infiltrate; left lung was clear. (R. 340). He had no respiratory symptoms upon examination. (R. 341). He had had no functional problems over the previous month. (R. 342). Pulse oximetry was normal. (R. 343).

In October of 2009, Mr. Carter sought treatment for some left-sided chest pain. Examination showed that his respiration was normal and he denied having any shortness of breath. His lungs were clear. He said he had no functional problems over the previous month. (R. 334). Pulse oximetry was normal. (R. 336). Mr. Carter rated his chest pain

as a 2 on a scale of 10. (R. 337). There was no pain upon deep breathing. (R. 330). Chest x-ray revealed some loss of lung volume on the right with interstitial fibrotic changes. There were also some changes in the upper left lung. (R. 333).

At a check up at the pulmonary clinic in November of 2009, the doctor noted that spirometry had indicated a "moderate pseudo-obstr[uction]." Mr. Carter had no shortness of breath of cough, and his sinus symptoms had been suppressed. (R. 260). A spirometry test on November 4th showed FEV at 68%(3.53) and FEV1 at 67%(2.76). FEV/FEV1 ration was normal. The interpretation was moderate obstructive airways disease, unchanged since September 2007. (R. 250).

At a December 2009 examination, Mr. Carter reported he had been intermittently experiencing a "pins and needles sensation" all over except his head. (R. 319). He again denied any shortness of breath or coughing. He had no muscular or joint pain or weakness. (R. 315). Lung sounds were normal. (R. 319). Pulse oximetry was normal. (R. 323). Mr. Carter reported he had had no functional difficulty over the last month. (R. 324).

The disability agency arranged a consultative examination for Mr. Carter with Dr. Chukwu Ezike. At this examination, Mr. Carter complained of shortness of breath and difficulty with exercise. He said he was on prednisone but "there were no known relieving factors." Mr. Carter told Dr, Ezike that he could walk about a mile, lift 50-70 pounds, stand for an hour at a time, and had no problems sitting. (R. 356). Lungs were clear and there were no rales, rhonchi, or wheezes. There were coarse breath sounds at the base. Gait was normal, and range of motion was normal throughout. Grip strength

and fine and gross manipulation were normal. (R. 357). Neurological examination was normal. (R. 358).

On November 27, 2010, spirometry testing showed FEV at 78%(3.53) and FEV1 at 70% (2.58). (R. 361). On November 30th, Dr. Richard Bilinsky reviewed the medical evidence for the agency. He concluded that Mr. Carter was capable of performing medium work where he was not exposed to respiratory irritants or poor ventilation. (R. 365-72).

At a follow-up appointment in May 2010, Mr. Carter complained of a pinching pain in the area of his third left rib. He again had no shortness of breath. (R. 314).

## C.

### The Administrative Hearing Testimony

At his administrative hearing, Mr. Carter testified that he collected unemployment insurance in 2006 and 2007. He was looking for work but couldn't find anything. (R. 43-44). He said his lung impairment was what keeps him from working. His hands were fine. He had no problems driving. (R. 44). Mr. Carter said his medication had the side effects of swelling and weight gain. (R. 45). He said he wasn't taking any medication at the time of the hearing. (R. 46). He said he felt the same with or without the Prednisone. (R. 47). He said he didn't think the Prednisone helped him. (R. 47-48).

Mr. Carter testified that he could lift 20 pounds, but not continuously. He could walk about a mile. He had problems climbing stairs; he needed to pause now and then. (R. 49). When his attorney questioned him, Mr. Carter said he could lift only 10 pounds repeatedly; he could lift 20 pounds but not over and over again. (R. 52). He recounted

how he used to jog, but he hadn't done so in 6 or 7 years. He couldn't breathe well enough to run. (R. 64).

On a typical day, Mr. Carter would use his computer. (R. 55). He went to church 3 or 4 times a week. (R. 45). He sometimes suffered fits of sneezing. (R. 55). He said he had some low back pain and some numbness in his hands and left leg. (R. 55).

Stephen Sprauer then testified as a vocational expert ("VE"). He explained that Mr. Carter's past work as a machinist was skilled and medium in exertional level. (R. 59). The ALJ asked Mr. Sprauer whether a hypothetical 50-55-year-old individual with a high-school education, capable of lifting 50 pounds occasionally and 25 pounds frequently, standing/walking and sitting for six 6 hours, occasionally climbing ladders, ropes, and scaffolds but has to avoid all but occasional exposure to respiratory irritants could perform Mr. Carter's past work. The VE said yes. (R. 59-60). Of the same individual could not perform at production-rate job, he would be unable to do machinist work, but could perform jobs like industrial sweeper/cleaner, dining room attendant, or packaging machine operator. (R. 59).

If the same person could lift only 20 pounds occasionally, they could perform jobs like small products assembler, counter clerk, or bakery wrapper. (R. 61). If the person could not perform production rate jobs, they could still do the counter clerk job, and could also do jobs like survey worker or cashier. (R. 62).

### III.

### THE ALJ'S DECISION

The ALJ found that Mr. Carter had a severe impairment: sarcoidosis with scarring of the lungs. (R. 28). The ALJ further found that Mr. Carter's impairment did not meet

7

the listings, specifically, listing 3.02 for chronic pulmonary insufficiency. He did not have FEV values equal or less than 1.65, chronic impairment of gas exchange, or significantly abnormal arterial blood gas values. (R. 29). Next the ALJ determined that Mr. Carter retained the capacity to lift 50 pounds occasionally, 25 pounds frequently, sit, stand, or walk for 6 hours each in an 8-hour workday, occasionally climb ladders, ropes, or scaffolds, avoid concentrated exposure to pulmonary irritants like dust or fumes and poor ventilation. He could not perform fast-paced production work. (R. 29).

Along the way, the ALJ recounted Mr. Carter's daily activities, cough, congestion, and numbness in his hands. (R. 30). The ALJ discussed the consultative examination results, noting that the exam was essentially normal, and that Mr. Carter had said he could lift 50-70 pounds. (R. 30). The ALJ started that Mr. Carter's sarcoidosis could be expected to produce the symptoms he complained of, but not to the degree he claimed or to an extent inconsistent with her residual functional capacity determination. (R. 30). The ALJ noted that several times, treating physicians had noted that Mr. Carter's symptoms had cleared with Prednisone, even though Mr. Carter had testified it hadn't helped. (R. 30). She noted that Mr. Carter told physicians that exercise and exertion did not cause him shortness of breath. Mr. Carter also repeated said he had no functional difficulties. And the ALJ noted that Mr. Carter received unemployment benefits and had looked for work. (R. 31). She added that Mr. Carter's statement of his limitations was not consistent with the objective medical evidence. (R. 31). No treating physicians had indicated that Mr. Carter was disabled. Disability agency reviewing physicians found him capable of medium work. (R. 31).

The ALJ went on to consider Mr. Carter's age, education, and work experience. She then relied on the VE's testimony to find that, while Mr. Carter could not do his past work he could do other work that exists in significant numbers in the regional economy. As a result, she concluded that Mr. Carter was not disabled and not entitled to benefits under the Act.

## IV.

## DISCUSSION

### A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, – F.3d –, —, 2008 WL 340513, *5 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 2008 WL 340513, *5; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 2008 WL 340513, *6; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 2008 WL 340513, *5.

## B.

### The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

Mr. Carter first argues that the ALJ failed to adequately review Mr. Carter's condition under the Listing of Impairments. Specifically, Mr. Carter contends that the ALJ ignored the testing that revealed his diffusion rate was just 40%. Under listing 3.02(c)(1), an individual is considered disabled as a result of chronic pulmonary insufficiency when the single breath DLCO is "less than 40% of predicted value." 20 CFR Pt. 404, Subpt. P App. 1, §3.02(c)(1). Mr. Carter's testing resulted in values of 40% and 43%, both above the threshold for meeting the listing. So the ALJ did not err in that respect. If the ALJ did ignore the diffusion rates, it was harmless error because the result would have been the same.

Mr. Carter also argues that if he did not meet the listing, he at least equaled it. It's not clear how. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006)(claimant has

11

the burden of proving his condition meets or equals a listed impairment). During his trips to see his treating physicians at the Veterans' Hospital and the pulmonary clinic, Mr. Carter consistently reported good suppression of his symptoms on prednisone and no functional limitations whatsoever. Moreover, the ALJ also considered the opinions of agency physicians who, at various stages in the proceedings, reviewed the medical evidence and did not find that Mr. Carter's condition equaled a listing. (R. 29). Those opinions stand uncontradicted and constitute substantial evidence to support the ALJ's step 3 determination. *Filus v. Astrue*, 694 F.3d 863, 867 (7th Cir. 2012); 20 CFR §404.1526(b).[2]

Mr. Carter next argues that the ALJ erred in his consideration of his testimony, specifically, the fact that he received unemployment insurance during the period he claims he was disabled. When a person applies for unemployment insurance, he represents to state authorities that he is able to work. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). That's inconsistent with a representation to federal authorities by the same person that he is unable to work. Under applicable law[3], the contradiction is an appropriate consideration for an ALJ making a credibility determination. *Id.*

But that's not all the ALJ relied upon in finding Mr. Carter to be an unreliable witness. As the ALJ pointed out, Mr. Carter told his doctors one thing and told her

---

[2] Mr. Carter argues that the ALJ relied entirely on the opinion of Dr. Ezike and that the doctor did not consider an x-ray from 2002 or the diffusion rate. But the ALJ relied on the opinion of Dr. Bilinsky, who reviewed all the evidence on file as of November 2010, *including* the diffusion rate. (R. 366).

[3] Mr. Carter relies on case law that indicates there is no adverse presumption should arise in an Americans with Disabilities Act case when the plaintiff applies for disability benefits. *See Cleveland v. Policy Management Systems, Corp.*, 526 U.S.795 (1999). Of course, the laws have differing standards, and the issue of reasonable accommodation that is often a factor in ADA cases is not a factor here.

another. At his hearing, he complained that Prednisone did not work. His visits to his doctor demonstrate that just the opposite is true. He also repeatedly told his physicians that he had no functional limitations and his shortness of breath and coughing had resolved. At his hearing, of course, he gave rather a more dire assessment of his condition. Such discrepancies provide ample reason for an Alj to find a claimant not credible. *Pepper v. Colvin*, 712 F.3d 351, 368 -369 (7th Cir. 2013); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010).

The ALJ also considered Mr. Carter's statements as to what he was capable of doing. Again, Mr. Carter's testimony in this regard was inconsistent. He variously said he could lift 50-70 pounds, 50 pounds, 20 pounds, or only 10 pounds. Mr. Carter prefers that the ALJ would have accepted only his lowest estimates but, again, as the ALJ pointed out, Mr. Carter repeatedly told doctors that he had no functional limitations. Being able to lift no more than 10 or even 20 pounds would count as a functional limitation. Mr. Carter's estimation that he could lift 50 pounds was more in keeping with what he told his treating physicians.

Mr. Carter also complains (quite correctly) that the ALJ employed the boilerplate language that the Seventh Circuit has repeatedly criticized:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment . . . .

(R. 30). *See, e.g., Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012); *Martinez v. Astrue,* 630 F.3d 693, 694 (7th Cir.2011); *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir. 2010). But the Seventh Circuit has also stated that the language is not toxic; it is harmless if the ALJ provides additional reasons for her finding. *See Filus*, 694 F.3d 863,

868 (7th Cir.2012); *Shideler v. Astrue,* 688 F.3d 306, 311–12 (7th Cir.2012). As already discussed, the ALJ provided plenty of reasons – all valid – for doubting Mr.Carter's allegations. Once an ALJ furnishes such reasoning, her credibility determinations are entitled to deference, and the court will not overturn them unless they are "patently wrong." *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir.2010). Mr. Carter fails to show the credibility determination here was "patently wrong." Far from it, in focusing on the "boilerplate argument" in his brief, Mr. Carter simply ignores all the reasoning the ALJ employed.[4]

Finally, Mr. Carter seeks to cast doubt on the ALJ's conclusion that he could perform medium work. But none of Mr. Carter's physicians found him incapable of doing any type of work, while agency physicians determined he could perform medium work. When agency physicians' opinions are uncontradicted, it is entirely appropriate for the ALJ to rely upon them in formulating her residual functional capacity determination. *Murphy v. Astrue*, 454 Fed.Appx. 514, 519 (7th Cir. 2012); *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008).

More specifically, Mr. Carter argues that he cannot perform the work the ALJ determined he could because of the pace. Mr. Carter reasons that if he can't do his past medium work, he can't perform, other medium work because of the pace. But the ALJ clearly allowed for such a restriction in her hypothetical to the VE. She said Mr. Carter could not do work that required a production rate. While this disqualified him from his

---

[4] The "boilerplate argument" is becoming meaningless boilerplate itself, as disability plaintiff's attorney regularly pepper their briefs with it regardless of whether it is applicable or persuasive in the context of the case. When an ALJ provides reasons for disbelieving a claimant's testimony, plaintiff's counsel may argue that those reasons are invalid, but a "boilerplate argument" has no basis in fact.

14

past work as a machinist, it left the door open to thousands of other medium-level – and light-level – jobs. (R. 60).

Mr. Carter also asserts that there is no way he could occasionally climb ladders, ropes, or scaffolds, and points to his testimony that he had difficulty with stairs. But, again, the ALJ did not find Mr. Carter's testimony entirely credible. It must be remembered that Mr. Carter consistently told his doctors that he had no functional limitations at all and that his medication was relieving all his symptoms. No doctor put any restrictions on his ability to climb. The only evidence he could not was subjective, and the ALJ was not patently wrong in disregarding it. Moreover, according to the Dictionary of Occupational Titles, the medium jobs at issue – industrial sweeper/cleaner, 389.683-010; dining room attendant, 311.677-018; and packaging machine operator, 920.685-078 – require any climbing at all. For all three jobs, the "Cl" or "climbing" requirement is denoted as "N", meaning never. Mr. Carter's climbing capabilities would not even be a factors in these jobs, which number in the area of 100,000 positions regionally.

## CONCLUSION

The plaintiff's motion for reversal and remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/30/13

15